ALVIN C. MOYER and SUZANNE C. MOYER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent P.A.C. CONSTRUCTION CORPORATION, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Moyer v. Commissioner
Docket Nos. 8162-72, 8163-72.
United States Tax Court
T.C. Memo 1976-69; 1976 Tax Ct. Memo LEXIS 330; 35 T.C.M. (CCH) 304; T.C.M. (RIA) 760069; March 9, 1976, Filed Alvin C. Moyer, pro se in Docket No. 8162-72. Alvin C. Moyer (an officer), for the petitioner in Docket No. 8163-72. David W. Otto, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined deficiencies in Federal income tax of petitioners Alvin C. and Suzanne C. Moyer for the calendar years 1967, 1968, and 1969 in the amounts of $ 5,870.90, $ 3,497.57, and $ 4,743.55, respectively, and additions to tax under section 6653(a), I.R.C. *333 1954, [1] for such calendar years in the amounts of $ 293.54, $ 174.88, and $ 237.18, respectively. Respondent determined deficiencies in Federal income tax of petitioner P.A.C. Construction Corporation for the calendar years 1968 and 1969 in the amounts of $ 493.68 and $ 267.41, respectively, and additions to tax under section 6653(a) for such calendar years in the amounts of $ 24.68 and $ 13.37, respectively. The issues for decision with respect to petitioners Alvin C. Moyer and Suzanne C. Moyer are: (1) Whether they are entitled to net operating loss deductions under section 172 for the calendar years 1967, 1968, and 1969 in the amounts of $ 28,793.77, $ 270,000, and $ 268,255, respectively; (2) whether they are entitled to deductions for interest under section 163 for the calendar years 1967, 1968, and 1969 in the amounts of $ 1,200, $ 999.45, and $ 1,665.81, respectively. (3) whether they are entitled to deductions for medical expenses under section 213 in excess of the amounts of $ 206.74 and $ 465.35 allowed by respondent for the calendar years 1967 and 1968, *334 respectively; (4) whether they are entitled to deductions for taxes under section 164 in the amounts of $ 561.08 and $ 654.98 for the calendar years 1968 and 1969, respectively; (5) whether they are entitled to deductions for automobile business expenses under section 162 in the amounts of $ 800, $ 2,200, and $ 69 for the calendar years 1967, 1968, and 1969, respectively; (6) whether they are entitled to deduct amounts paid for legal fees for the calendar years 1968 and 1969; (7) whether they are entitled to a deduction in the amount of $ 1,500 for a casualty loss under section 165 for the calendar year 1967; (8) whether they received a distribution of available earnings of P.A.C. Construction Corporation in the amounts of $ 824.49, $ 1,971.47, and $ 2,244.95 for the calendar years 1967, 1968, and 1969, respectively; (9) whether they received additional income for services rendered in the amount of $ 8,833.93 for the calendar year 1967; and (10) whether they are liable for an addition to tax for negligence under section 6653(a) for each of the calendar years 1967, 1968, and 1969. The issues for decision with respect to P.A.C. Construction Corporation are: (1) Whether *335 it is entitled to a net operating loss deduction under section 172 in the amount of $ 10,000 for each of the calendar years 1968 and 1969; (2) whether it is entitled to deduct the amount of $ 2,040 for depreciation under section 167 for the calendar year 1968; (3) whether it is entitled to a deduction for legal fees under section 162 for the calendar year 1969; and (4) whether it is liable for an addition to tax for negligence under section 6653(a) for each of the calendar years 1968 and 1969. FINDINGS OF FACT At the time of the filing of their petition in this case petitioners Alvin C. and Suzanne C. Moyer, husband and wife, were residents of Pittsburgh, Pennsylvania. They filed joint Federal income tax returns for the calendar years 1967, 1968, and 1969 with the District Director of Internal Revenue, Pittsburgh, Pennsylvania. At the time of the filing of its petition in this case petitioner P.A.C. Construction Corporation, which was incorporated under the laws of the State of Delaware, had its principal place of business at Pittsburgh, Pennsylvania. It filed Federal corporate income tax returns for the calendar years 1968 and 1969 with the District Director of Internal *336 Revenue, Pittsburgh, Pennsylvania. Petitioner Alvin C. Moyer (hereinafter A.C.) has been engaged for many years in the engineering and construction business in Altoona, Pennsylvania. Prior to April 1, 1959, A.C. was associated with his brother, Jacob E. Moyer (hereinafter Jacob) in an equal partnership doing business as Moyer Brothers (hereinafter Moyer Brothers or partnership). During 1958 Moyer Brothers incurred a substantial operating loss of $ 541,687.74 and as of December 31, 1958, A.C.'s and Jacob's capital investment in the partnership had been reduced to zero by their respective distributive shares of the partnership's operating loss for 1958 and prior years. An uncertified balance sheet of the partnership as of December 31, 1958, reflected the following assets and liabilities: Assets
Notes and Accounts
Receivable
$ 127,841.12
Inventories
130,000.00
Investments
83,042.09
Prepaid Insurance
15,499.42
Life Insurance
56,378.40
Deferred Costs of Un-
completed Contracts
2,803,433.92
Buildings $ 787,076.13
Accumulated
Depreciation 610,257.18
176,818.95
Land
13,240.24
$ 3,406,254.14
Liabilities
Accounts and Notes
Payable
1,612,093.64
Accrued Expenses
31,977.30
Payments on Uncompleted
Contracts
2,088,296.16
$ 3,732,367.10
*337 An uncertified balance sheet of the partnership as of February 15, 1959, indicated that the fair market value of the partnership's assets was $ 2,949,933.80, which included the surrender value of the partners' life insurance policies of $ 56,378.40, the value of its land and buildings of $ 294,100, and of its investments, among others, in Altoona Coal & Equipment Company, Inc. of $ 190,000, Fairlawn Realty Corporation, a wholly owned corporation of the partnership of $ 46,250, and Fairlawn Improvement Corporation of $ 7,000. Its liabilities were represented as $ 1,548,369.52, of which the amount of $ 73,832.76 was reflected by a note payable to A.C. for his advances to Moyer Brothers during 1958, the amount of $ 30,000 was shown as a note payable to the Central Trust Company, and the amount of $ 25,777.47 was indicated as accrued expenses. The insurance policies issued to A.C. and Jacob were pledged to a local bank to secure loans to Moyer Brothers. As of March 25, 1957, A.C. individually owned a half interest in a Pennsylvania corporation, Hoffman Hotel of Cresson, Inc. (hereinafter Hoffman Hotel), which on that day acquired subject to two or more real estate mortgages a hotel *338 in Cresson, Pennsylvania. On that day A.C., in his capacity as president of Hoffman Hotel, executed a chattel mortgage to secure a loan from him in his individual capacity to Hoffman Hotel in the principal amount of $ 28,793.77 with interest payable at the rate of 5 percent per annum. Such chattel mortgage recited that the mortgage was given to secure the payment of a note of that day for the aforementioned sum, executed by the mortgagor, Hoffman Hotel, and made payable to the mortgagee, A.C. In 1959 the partnership was in default to its creditors and some of them filed liens against the personal property of A.C. and Jacob as individuals and as partners of Moyer Brothers and in some cases judgments from the local court were obtained against them. At the insistence of several of the creditors who had obtained judgments, writs of execution were issued by the local court. On April 16, 1959, a levy was made against the personal property of A.C. and Jacob as individuals and as partners of Moyer Brothers. P.A.C. Construction Corporation (hereinafter P.A.C.) was incorporated in June 1959. Clark Moyer, a brother of A.C. and Jacob, was its president and sole stockholder. Several of the *339 judgments that had been obtained by the creditors of the partnership were assigned to P.A.C. either directly or indirectly through Clark Moyer. The assignors received from Clark Moyer or P.A.C. the amount of $ 5,000 for the release of their judgments. By virtue of the judgments having been assigned to it, P.A.C. caused, in the name of one of its assignors, the foreclosure sale of the personal property of A.C. and Jacob as individuals and as partners of Moyer Brothers, which included the partnership's furniture, construction equipment, motor vehicles, airplanes, tools, supplies, commercial paper and accounts receivable, and A.C.'s and Jacob's interest in Fairlawn Improvement Corporation and A.C.'s interest in Hoffman Hotel. The note of Hoffman Hotel and the chattel mortgage that was security therefor and Fairlawn Realty Corporation were not among the assets recited on the sheriff's schedule of assets that were levied upon or sold at the foreclosure sale. On July 3, 1959, the foreclosure sale was held and P.A.C., through its attorney, purchased A.C.'s and Jacob's individual and partnership personal property for the amount of $ 448.10, the cost of the sale. It was the belief of P.A.C. *340 's attorney that the sale and purchase of such personal property had divested all prior interests, including that of the United States, except for interests which were secured by chattel mortgages such as were held by a local bank and New York Factors, Inc. For personal reasons Clark Moyer caused P.A.C. by virtue of his being its president and sole shareholder to enter into an agreement with the United States on October 15, 1959. This agreement provided the subordination of any right of P.A.C. to the personal property it purchased at the foreclosure sale to the extent of the amount of the liens for tax due that had been filed prior to that sale by the United States against the personal property of Moyer Brothers. The effect of the agreement was to have P.A.C. account to the United States for the amount of the outstanding tax liability of A.C.'s and Jacob's that arose out of the partnership to the extent that P.A.C. had any interest in the property upon its disposition after the satisfaction of the interest of the secured creditors in that property. In late 1959 Clark Moyer transferred his shares of stock of P.A.C. to A.C. and took the loss he had sustained. During 1960, A.C. succeeded *341 Clark Moyer as president of P.A.C. After 1959, A.C. devoted his energies to operating P.A.C. profitably, but he was unsuccessful. P.A.C. was unable to meet the demands of the former creditors of Moyer Brothers for payments on the chattel mortgages they held on the equipment that P.A.C. had purchased at the foreclosure sale. On June 19, 1959, A.C. executed a note in the amount of $ 15,000 payable to a local attorney for his legal services. In July 1959, the attorney obtained a judgment on the note. Subsequently the note and judgment were assigned by the local attorney to another individual who ultimately assigned them to an attorney who had formerly represented A.C. and was sympathetic to his circumstances. On June 6, 1960, the attorney purchased A.C.'s home in Pittsburgh which was security for an existing mortgage at a foreclosure sale initiated by him. A sheriff's deed evidencing this sale was recorded on October 19, 1960. The attorney permitted A.C. to live in the home after he had purchased it and to pay him such sums as A.C. was able. A.C. paid the amount of $ 1,200 to this attorney in 1967. The attorney made the payments on the mortgage and paid the real estate taxes on the *342 property. In 1957 New York Factors, Inc. (hereinafter New York), loaned the amount of $ 400,000 to A.C. and Jacob, individually and as partners of Moyer Brothers, Moyer Brothers Construction Company, Inc., and Altoona Coal and Equipment Company, Inc. The loan was secured by a chattel mortgage on their equipment. New York's loan was in default and during 1960 New York filed liens and obtained judgments against A.C. and Jacob, Moyer Brothers, Moyer Brothers Construction Company, Inc., and Altoona Coal and Equipment Company, Inc. New York subsequently executed on such judgments and foreclosed on various items of equipment owned by these corporations or which had been sold to P.A.C. at the foreclosure sale of Moyer Brothers. In 1960 some insurance policies issued to A.C. were surrendered to the insurance company and the value thereof in the amount of $ 21,088.95 was paid to the Altoona Central Bank and Trust Company to which they had been pledged to secure loans to Moyer Brothers, in two installments, the first on May 24, 1960, and the second on June 30, 1960. On December 21, 1961, the life insurance company paid the amount of $ 4,892.18 to New York. As of June 1962 the balance of *343 New York's loan in the amount of $ 180,000 was outstanding. In January 1964, the life insurance company paid the amount of $ 371 to New York in connection with its foreclosure. On January 24, 1962, the note that was secured by a second mortgage against the premises owned by Hoffman Hotel was in default and a judgment was entered against Hoffman Hotel in favor of Eleanor Jones and Mary Ferris, the assignees of the note that was secured by the second real estate mortgage. On February 23, 1962, these premises were sold at a foreclosure sale to these assignees. On March 1, 1962, at a subsequent foreclosure sale the personal property located on the premises and used in the operation of the hotel was sold to Eleanor Jones and Mary Ferris. The sheriff's deed evidencing the sale of such premises to Eleanor Jones was recorded on May 16, 1966. During 1960 through 1965 P.A.C.'s principal business activity was leasing its construction equipment. It applied the rental payments it received to repay the loans that had been made by a local bank and others that were secured by chattel mortgages against P.A.C.'s equipment. The real property that had been formerly used as Moyer Brothers' principal *344 business establishment on which a local bank held a real estate mortgage was conveyed to P.A.C. prior to 1964. In 1960 the outstanding loans by the local bank that were secured by the real estate and chattel mortgages were in default and the local bank assigned these indebtednesses and the security instruments to Mon-Valley Enterprises (hereinafter Mon). On December 12, 1961, an agent for David H. Weyers paid the attorney for Mon the sum of $ 5,000 in partial payment of the purchase price of approximately $ 51,000 for the assignment of the real estate and chattel mortgages that Mon held to David H. Weyers. A similar payment was made by the agent to Mon's attorney on January 19, 1962. On May 21, 1962, Mon's attorney and P.A.C.'s and Moyer Brothers' attorney entered into an agreement that provided for P.A.C.'s authorization of Mon's sale to a third party of three pieces of construction equipment that P.A.C. owned and upon which Mon held a chattel mortgage, the payment by P.A.C. to Mon of $ 10,000 as of May 29, 1962, and upon such sale and payment the execution by Mon of an option to purchase the real estate and chattel mortgages it held for the balance of the then outstanding indebtedness *345 of $ 53,138.19 against which the sale proceeds and payment of $ 10,000 were to be credited. On July 6, 1962, Mon sold two of the three pieces of construction equipment to W. & T. Salvage Company for $ 10,233.11. In 1962 Mon attempted to obtain further payments on the outstanding indebtedness to it. Ultimately it assigned the indebtedness to it and the chattel and real estate mortgages to Nationwide Construction Company, Inc. (hereinafter Nationwide), and Murray and Rosella Friedlander (hereinafter Friedlanders). In October 1963, Continental Commercial Corporation obtained a writ of execution on a judgment against Nationwide, Nationwide Rent-A-Car, Inc., and the Friedlanders, and on January 31, 1964, to satisfy their judgment caused a foreclosure sale of the real property formerly used as the partnership's principal place of business on which Nationwide and the Friedlanders as assignees held the real estate mortgage. Capital Factors, Inc. initiated on September 17, 1963, a foreclosure action against Nationwide and Nationwide Rent-A-Car Co. in Pittsburgh. During 1967 through 1969, P.A.C. engaged in the business of hiring a construction consultant and of leasing equipment. A.C. in *346 his capacity as an independent consultant performed the consulting work for clients of P.A.C. Any monies that P.A.C. received during 1967, 1968, and 1969 from services rendered by A.C. to its clients or from its equipment rentals were distributed by P.A.C. to A.C. A.C. operated an automobile that was owned by P.A.C. to travel to the various construction sites of P.A.C.'s clients where he performed services for P.A.C. He paid for the gas and oil consumed. P.A.C. paid for repairs and insurance. In 1967, A.C. received the amount of $ 548.28 from a local attorney for reimbursement for expenses he had incurred in connection with services he had performed for a client of that attorney. A.C. paid an attorney in Pittsburgh the amount of $ 450 in 1968 and $ 1,400 in 1969 in connection with an appeal to the United States Court of Appeals for the Third Circuit. A.C. paid a local attorney the amount of $ 795 in 1968 and $ 1,105 in 1969 for legal services regarding his and P.A.C.'s liability for tax. Approximately one-half of such amount for the year 1969 was attributable to legal services performed for P.A.C. and the other half was attributable to services for A.C. During the years at *347 issue, neither A.C. nor P.A.C. maintained a checking account. A.C. made incomplete entries in a spiral notebook with respect to billings he made for services he performed and payments thereon. A.C. owned his home in Altoona as of June 1962. Some time thereafter the mortgagee foreclosed on that home. The balance of the proceeds of the sale after satisfaction of the mortgagee's interest was advanced by A.C. to P.A.C. In 1967 a wind and ice storm damaged the home in Pittsburgh which A.C. had owned prior to its sale to a local attorney in 1960 and in which A.C. was residing. The damages sustained to the roof of the house were approximately $ 1,500. On their joint Federal income tax returns for the calendar years 1963, 1964, and 1965, A.C. and his wife reported taxable income in the amounts of $ 2,054.12, $ 7,169.33, and $ 5,215.45, respectively. On April 27, 1967, they filed a claim for refund for the calendar year 1963 for losses sustained in February and March, 1962 by reason of a foreclosure sale of the hotel owned by Hoffman Hotel and in January 1964 by reason of a foreclosure sale of Moyer Brothers' property in Altoona, Pennsylvania. On their joint Federal income tax returns *348 for the calendar years 1962, 1966, 1967, 1968, and 1969, A.C. and his wife reported a taxable loss in the amounts of $ 48.22, $ 39,693.81, $ 17,375.58, $ 260,895.76, and $ 253,595.44, respectively. On January 20, 1970, a notice of deficiency was issued by respondent to A.C. and his wife with respect to the calendar years 1962, 1964, 1965, and 1966. In this notice their claims for refund for the calendar years 1963, 1964, 1965, and 1966 were denied, and a deficiency and additions to tax for each of the calendar years 1962, 1964, 1965, and 1966 asserted. A.C. and his wife filed a petition with this Court contending that respondent had improperly denied net operating loss deductions for the calendar years 1962, 1964, 1965, and 1966 arising from losses of $ 900,000 sustained by A.C. as a partner in a partnership during the calendar years 1958, 1959, 1960, 1961, 1962, and 1964. By agreement of the parties, a stipulated decision of this Court was entered on March 29, 1971, determining that there were deficiencies in income tax of A.C. and his wife for each of the calendar years 1962, 1964, 1965, and 1966 and additions to tax for each of the years 1962, 1964, and 1965. [2]
*349 On their joint return for the calendar year 1967 A.C. and his wife claimed a net operating loss carryforward of $ 28,793.77 for the loss during 1966 on the note executed by Hoffman Hotel that was secured by a chattel mortgage on the hotel's personal property. They claimed itemized deductions in the amounts of $ 19.50 for charitable contributions, $ 150 for interest on an automobile, $ 1,200 for interest on their home mortgage, $ 839.74 for medical expenses as a result of payments for drugs and medicine, and $ 3,352.55 for miscellaneous deductions which were composed of $ 800 for business use of a car, $ 1,500 for wind and ice damage to their dwelling, and $ 1,052.55 for other expenses. Form 1099 attached to their return showed that an attorney paid A.C. the amount of $ 8,028.26 of which they reported the amount of $ 7,479.98. On their joint income tax return for the calendar year 1968, A.C. and his wife claimed deductions with respect to employee business expenses of $ 3,395 which were composed of legal fees of a Pittsburgh tax attorney of $ 400, legal fees of a local tax attorney of $ 795, and business expenses of $ 2,200 for car travel, computed on the basis of 15,000 miles at *350 10 cents per mile and 10,000 miles at 7 cents per mile; interest payments of $ 605.33 on the mortgage on their Pittsburgh home and $ 394.12 on the note held by the attorney who had purchased their Pittsburgh home; the amount of $ 567.30 for medical expenses; the amount of $ 561.08 for tax paid on their home; interest on the automobile of $ 251.64; gasoline tax of $ 124, computed on the basis of 25,000 miles; miscellaneous expenses of $ 221.77; and a net operating loss deduction of $ 270,000. Attached to their return was a statement that they were entitled to a loss carryforward of at least $ 270,000 to 1968 inasmuch as A.C. had sustained losses of $ 147,050 in 1964 and $ 128,436.22 in 1966 of which no more than $ 5,486.22 was used in 1967. On their joint income tax return for the calendar year 1969, A.C. and his wife claimed itemized deductions of $ 650.98 for real estate taxes, $ 124 for local gasoline taxes, $ 244 for general sales taxes, $ 557.99 for interest on the home mortgage, $ 1,004.22 for interest on the note assigned to the Pittsburgh attorney, $ 203.60 for other interest payments, $ 1,000 for legal fees of a Pittsburgh attorney, $ 69 for automobile insurance, and a net *351 operating loss deduction of $ 268,255.36 for a net operating loss carryforward from 1968 and earlier years. On its corporate income tax returns for the calendar years 1963 through 1969, inclusive, P.A.C. reported income, deductions, and taxable income as follows: Income
1963
1964
1965
1966
$ 9,350.00
$ 7,600.00
$ 6,000.00
$ 12,000.00
Deductions
Compensation of officers
7,145.58
11,000.00
Repairs
557.82
475.82
110.66
Taxes
154.40
115.00
Interest
145.60
232.16
203.12
Losses by casualty or
theft
7,500.00
Depreciation
1,191.50
1,456.75
3,120.00
Other
1,283.29
2,018.88
911.17
2,035.38
Net operating loss
deduction
10,000.00
Taxable Income
(973.77) *
(2,073.28)
2,809.10
(14,469.16)
Income
1967
1968
1969
$ 12,000.00
$ 19,541.39
$ 24,200.00
Deductions
Compensation of officers
11,000.00
16,824.48
22,113.35
Repairs
48.75
Taxes
Interest
206.00
Losses by casualty or
theft
225.00
Depreciation
2,540.00
2,165.00
Other
1,550.00
551.91
2,086.65
Net operating loss
deduction
10,000.00
10,000.00
10,000.00
Taxable Income
(13,569.75)
(10,000.00)
(10,000.00)
*352 On its corporate income tax return for the calendar year 1964, P.A.C. claimed a deduction for car expense and insurance. On its corporate income tax return for the calendar year 1965, P.A.C. claimed a deduction for the sales tax paid on the purchase of an automobile and amounts paid for insurance and automobile expenses. On its corporate income tax return for the calendar year 1966, P.A.C. claimed a deduction for depreciation of a 1962 Cadillac automobile and for expenses paid for automobile insurance and repairs. The net operating loss was stated to have been the result of a net operating loss carryforward from 1964 and 1965. On its corporate income tax return for the calendar year 1967, P.A.C. claimed a deduction for depreciation of a 1962 Cadillac and for expenses of $ 275 for automobile insurance and $ 48.75 for automobile expense and repairs. The net operating loss was stated to have resulted from a net operating loss carryforward from 1964, 1965, and 1966. On its corporate income tax return for the calendar year 1968, P.A.C. claimed a deduction for the amounts of $ 2,040 for depreciation of equipment, $ 125 for depreciation of a Thunderbird automobile, *353 and $ 91.50 for automobile insurance and $ 10,000 for a net operating loss that was the result of a net operating loss carryforward from 1964, 1965, 1966, and 1967. On its corporate income tax return for the calendar year 1969, P.A.C. claimed a deduction for a net operating loss of $ 10,000 that resulted from a net operating loss carryforward from 1965, 1966, 1967, and 1968 and for expenses of $ 2,086.65 for legal fees, business travel, including gas, and other. In April 1967, P.A.C. filed a claim for refund with respect of tax it paid during the calendar year 1965 by reason of a carryforward of a net operating loss sustained by P.A.C. in 1964 as a result of a foreclosure sale of its property and equipment in Pittsburgh. This claim was not allowed. Respondent issued a statutory notice of deficiency dated January 20, 1970, to P.A.C. asserting deficiencies in its income tax and additions to tax for the calendar years 1961, 1962, 1964, and 1965. On April 14, 1970, P.A.C. filed a petition in this Court for a redetermination of its income tax liability for the calendar years 1961, 1962, 1964, and 1965. On March 29, 1971, this Court entered its decision pursuant to an agreement of *354 the parties that there was no deficiency in income tax of P.A.C. for 1961 and there were deficiencies in income tax of P.A.C. and additions thereto for each of the calendar years 1962, 1964, and 1965. [3]
Respondent issued a notice of deficiency dated August 1, 1972, to P.A.C. asserting deficiencies in income tax and additions thereto for the calendar years 1968 and 1969. Respondent disallowed for the calendar year 1968 the amounts of $ 2,040 deducted by P.A.C. for depreciation and $ 10,000 deducted by P.A.C. as a net operating loss deduction. Respondent disallowed for the calendar year 1969 the amounts of $ 1,105 that P.A.C. claimed as a deduction for legal expenses and $ 10,000 *355 claimed by P.A.C. for a net operating loss deduction. Respondent issued a notice of deficiency to A.C. and Suzanne C. Moyer for deficiencies in income tax and additions thereto under section 6653(a) for the calendar years 1967, 1968, and 1969. With respect of the calendar year 1967, respondent determined that petitioners had income in the amount of $ 8,833.93 for compensation and $ 824.49 for dividends in addition to that reported, that they were not entitled to a net operating loss deduction of $ 28,793.77, that they were not entitled to a deduction for medical expenses in excess of $ 206.74, for interest of $ 1,200 on a home mortgage, for business use of an automobile of $ 800, and for damage to a dwelling of $ 1,500. For the calendar year 1968 respondent determined that petitioners A.C. and his wife had dividend income from P.A.C. of $ 1,971.47 and that they were not entitled to a net operating loss deduction of $ 270,000, to a medical expense deduction in excess of $ 465.35, to interest deductions of $ 605.33 and $ 394.12 on mortgage payments relating to the Pittsburgh home, to real estate tax of $ 561.08 on that home, and to employee business expenses of $ 3,395 which were *356 composed of legal fees of $ 400 and $ 795 paid to a Pittsburgh and an Altoona attorney, respectively, and $ 2,200 paid for use of an automobile. For the calendar year 1969, respondent determined that petitioners A.C. and his wife received additional income of $ 2,244.95 from dividends from P.A.C. and that they were not entitled to deductions for a net operating loss carryforward of $ 268,255, for tax of $ 654.98, for interest on their home mortgage of $ 557.99, for other interest of $ 1,104.22, for legal fees of $ 1,000, and for automobile insurance of $ 69. Respondent allowed the standard deduction of $ 1,000 for each of the calendar years 1967, 1968, and 1969, and the amounts of $ 1,052.55 and $ 221.77 for the calendar years 1967 and 1968, respectively, for miscellaneous business expenses. OPINION It is the position of petitioners Moyers that they are entitled to a net operating loss deduction for the calendar years 1967, 1968, and 1969 in the amounts of $ 28,793.77, $ 270,000, and $ 268,255, respectively, by virtue of a carryforward of a net operating loss from prior years. They argue that these previous net operating losses were in large part a result of losses that A.C. sustained *357 during 1957 from an operating loss of the partnership of approximately $ 60,000 of which half was attributable to him, during 1958 from an operating loss of the partnership of approximately $ 540,000 of which half was attributable to A.C., during 1959 from a loss of approximately $ 73,000 by the partnership's default on his loan, and from the loss of $ 353,340 on the foreclosure sale by P.A.C. of Moyer Brothers' personal property, during 1961 from a loss of $ 101,000 on the foreclosure sale by New York of equipment on which it had a mortgage, during 1960, 1961, 1962, and 1963 from the loss of approximately $ 26,000 by the forfeiture of A.C.'s life insurance policies, during 1962 from a loss of $ 26,625 on the foreclosure sale of Fairlawn real estate, during 1963 and 1964 from a loss of $ 800,000 by the divestiture of the partnership's assets of $ 1,600,000, during 1964 from a loss of $ 147,050 on the foreclosure sale of his and Jacob's interest in the real property on which their partnership formerly operated its business, during 1966 from losses of approximately $ 44,000 on the default by Hoffman Hotel on the principal and interest on the loans he had made to it, and during 1966 from *358 a loss of $ 90,000 on his investment in Hoffman Hotel. Petitioners Moyers contend that for the calendar year 1967 A.C. did not receive any additional income from his services and that they were entitled to a deduction for a casualty loss of $ 1,500 for damages to their Pittsburgh home. Petitioners contend they are entitled to deductions for medical expenses of $ 839.74 and $ 567.30 for the calendar years 1967 and 1968, respectively. For the calendar years 1967, 1968 and 1969, the Moyers' position is that they did not receive dividend distributions from P.A.C. in the amounts of $ 824.49, $ 1,971.47 and $ 2,244.95, respectively, and were entitled to deduct as interest on the mortgage on their homes the amounts of $ 1,200, $ 999.45 and $ 557.99, respectively, and to deduct as A.C.'s business expenses for his use of an automobile the amounts of $ 800, $ 2,200 and $ 69, respectively. For the calendar years 1968 and 1969 the Moyers' contention is that they are entitled to deduct the respective amounts of $ 1,195 and $ 1,000 for legal fees, and the respective amounts of $ 561.08 and $ 654.98 for taxes paid. For the calendar year 1969 the Moyers further argue that they are entitled to *359 an interest deduction of $ 1,004.22 on the note A.C. had executed to a Pittsburgh attorney and of $ 100 for other interest. P.A.C. contends that it is entitled to a deduction for depreciation of various equipment of $ 2,040 for 1968, for a net operating loss deduction of $ 10,000 for each of the years 1968 and 1969, and for legal fees of $ 1,105 for 1969. Respondent contends that the Moyers and P.A.C. have failed in carrying the burden of proof to show that they are entitled to their claimed deductions for each of their respective taxable years at issue. However, respondent concedes that A.C. in 1968 and 1969 paid legal fees of $ 795 and $ 1,105, respectively, for tax advice for himself and for P.A.C., [4] that A.C. received additional income of $ 548.28 rather than the amount of $ 8,833.93 for his services during 1967 and dividend income in 1967, 1968, and 1969 only to the extent of P.A.C.'s net earnings for those years. It is respondent's final contention that the Moyers and P.A.C. were each negligent in reporting their respective taxable income for each of their respective taxable years at issue. *360 Section 172(a) allows a net operating loss deduction for a taxable year in an amount equal to the amount of the net operating loss carried forward to that year and the amount of the net operating loss carried back to that year. Section 172(b)(c) and (d) generally provides that a net operating loss, the excess of deductions over gross income with some modifications, for a loss year is carried back to each of the three preceding taxable years and then carried forward to each of the five succeeding taxable years, beginning with the earliest year and followed by each later year, to the extent that it is not absorbed by the taxable income, with adjustments, for each of the preceding taxable years to which it is carried. Petitioners have the burden of proving a net operating loss for a taxable year and the amount of such net operating loss that may be carried to the years at issue. Petitioners Moyers have claimed net operating loss deductions for 1967, 1968 and 1969 based on a carryforward of net operating losses incurred in prior years that resulted from A.C.'s business losses during the years *361 1957 through 1966. Petitioners Moyers have not shown that they incurred a net operating loss or the amount thereof for any taxable year from 1957 through 1966. A net operating loss is generally sustained by an individual taxpayer for a taxable year to the extent that there is an excess of deductions, excluding those relating to sections 151, 172, and 1202, and limiting those relating to capital losses and certain ordinary nonbusiness deductions, over gross income. See section 1.172-3, Income Tax Regs. The record here is silent regarding petitioners Moyers' amounts of gross income and deductions and the natures thereof for the taxable years 1957 through 1962, 1965 and 1966 so that for each year a net operating loss may not be determined. Therefore, we conclude that petitioners Moyers have failed to show that they had sustained a net operating loss for any of the years 1957 through 1962, 1965 and 1966. Moreover, even if they had sustained a net operating loss for years prior to 1962, such net operating losses may not be carried forward to the years at issue since under *362 section 172(b)(2) with exceptions not relevant to the facts here, a net operating loss may be carried forward for only five years. See section 1.172-4(a)(1), Income Tax Regs.
Petitioners Moyers contend that they sustained a net operating loss for each of the years 1962, 1963, 1964, and 1966 by virtue of losses that A.C. incurred during such respective years. [5]
Petitioners Moyers argue that A.C. incurred in 1962 losses of $ 26,625 by foreclosure on Fairlawn real estate; in 1963 and 1964 losses of $ 800,000 due to the loss of the partnership's business assets; in 1964 losses of $ 147,050 by the partnership's real estate foreclosure; in 1960 through 1963 losses of $ *363 26,000 from surrender of A.C.'s life insurance policies; and in 1966 losses of $ 90,000 on his investment and $ 44,000 on his loan with respect of Hoffman Hotel. Under the facts presented in this record, we are unable to find that A.C. incurred any losses or, if he did incur any losses, the amounts thereof during 1962 through 1966 which might have resulted in a net operating loss. [6] Petitioners Moyers have not shown that A.C. sustained in 1962 a loss on the foreclosure on the Fairlawn real estate. Fairlawn Improvement Corporation had been sold by the partnership to P.A.C. in 1959 and a loss, if any, sustained on the sale of Fairlawn Improvement Corporation by the partnership occurred in 1959. The record is not clear whether Fairlawn Realty Corporation was sold by the partnership to P.A.C. in 1959, but if it were any loss from this sale would have been sustained in 1959. To the extent that the partnership sustained in 1959 any loss with respect of Fairlawn Improvement Corporation or Fairlawn Realty Corporation, petitioners Moyers have not shown that A.C. as a partner did not deduct in 1959 his share of the partnership's loss for that year. If Fairlawn Realty Corporation was not sold *364 during 1959 at the foreclosure sale of property of the partnership, the evidence before us does not indicate whether A.C. as a partner or otherwise sustained any loss with respect of Fairlawn Realty Corporation. With respect to A.C.'s life insurance policies the record is inconclusive as to whether A.C. incurred a loss and, if so, the amount thereof and when it was sustained. However, the record suggests that the policies were pledged to or levied upon and surrendered by the partnership's creditors to discharge the liability of the partnership to repay loans previously made to it and that the partnership's adjusted bases in such policies were not in excess of the unpaid balance of the loans. Consequently there apparently was no loss on the surrender of these policies. *365 The record is devoid of any evidence that A.C. sustained any loss during 1963 and 1964 from loss of the partnership's business assets. There is no evidence that the partnership had any assets (other than perhaps some real property formerly used by Moyer Brothers) after the foreclosure sale of its personal property to P.A.C. in 1959 and any loss occasioned by that sale would have been incurred by the partnership in that year. If the partnership did retain any assets after the foreclosure sale during 1959, there is no evidence that it sold such assets for a loss, that it distributed such assets to A.C. and he sustained a loss on such distribution or on their ultimate disposition by him, or that A.C. sold his partnership interest for a loss. The record does not disclose that A.C. sustained a loss in 1964 by the foreclosure sale of the real property formerly used by the partnership as its principal place of business. While the record suggests that this property was sold at a foreclosure sale in 1964, there is no evidence that A.C. at that time owned any part of such property or, if he did, the amount of any loss he sustained on its sale. The record suggests that the partnership or its *366 partners had sold such property to P.A.C. and that P.A.C. owned the property at the time that it was purportedly sold at a foreclosure sale during 1964. Consequently, any loss upon its sale was attributable to P.A.C., not A.C. or the partnership. There is no evidence that in 1966 A.C. incurred a loss from his advances to and investment in the Hoffman Hotel. There is no evidence that A.C. sustained any loss or the amount thereof with respect to his interest, if any, in the Hoffman Hotel. Moreover, the record is clear that, if he did incur such a loss, it occurred in 1959 as his stock interest in the Hoffman Hotel was sold along with the partnership's personal property to P.A.C. at the foreclosure sale in 1959. Although the record is not clear, we believe that A.C. did make a loan in 1957 in the amount of $ 28,793.27 to the Hoffman Hotel and that such principal amount and interest thereon have not been paid. If the note and chattel mortgage were sold as part of A.C.'s individual personal property to P.A.C. at the foreclosure sale of the partnership's personal property in 1959, A.C. may have sustained a nonbusiness bad debt loss in 1959. However, if the note was not sold in 1959, there *367 is no evidence whether the debt became worthless and, if so, when it became worthless. The record does not disclose whether the Hoffman Hotel was unable to pay off the loans, and, if so, whether the loans could not be satisfied by the personal property in the hotel which was pledged as security for the loan even after the foreclosure sale of the hotel in 1962. Section 704(d) generally provides that a partner's distributive share of partnership loss for its taxable year is allowed only to the extent of such partner's adjusted basis in his partnership interest at the end of the partnership's taxable year in which such loss occurred or, if there is insufficient basis, at the end of the partnership's year in which the partner repays the excess loss. We note that even if the partnership incurred any losses on the foreclosure sale of its personal property, including its interest in Fairlawn Improvement Corporation, the surrender of its insurance policies, and the sale to P.A.C. of the real property formerly used in its business, petitioners Moyers have not shown that for the years 1962 through *368 1966 A.C. as a partner was entitled to any portion of any losses sustained by the partnership during any such year. We conclude that petitioners Moyers are not entitled in the years here in issue to any deductions for losses for the years 1962 through 1966 since the evidence in this record fails to show that any such losses were incurred. In fact the record shows that the Moyers either reported or subsequently agreed that they did have net taxable income for each of the years 1962, 1963, 1964, 1965 and 1966. Respondent contends that petitioners Moyers have failed to prove they are entitled to the itemized deductions claimed on their returns for 1967, 1968 and 1969, with the exception of certain legal fees. Petitioners Moyers contend that they are entitled to deduct for the calendar years 1967, 1968, and 1969 the amounts of $ 1,200, $ 999.45, and $ 557.99, respectively, for interest paid on the mortgage on their home in Pittsburgh. Section 163 generally allows a deduction for all interest paid by a taxpayer during a taxable year on his indebtedness. Petitioners Moyers have not shown that they paid any amount for interest. Even if they had, it is incumbent upon them to show that *369 they were personally and primarily liable to pay the interest on the indebtedness or were the legal or equitable owners of the real estate that was security for the loan on which they were not directly liable. See section 1.163-1(b), Income Tax Regs. Under the facts here petitioners Moyers have failed to show they were personally liable to pay any interest or that they owned, subject to a mortgage, the Pittsburgh home during 1967, 1968 or 1969. The facts here are clear that they did not own the Pittsburgh home in 1967, 1968 and 1969 as it was sold during 1960 to a Pittsburgh attorney who held legal title to the property. Petitioners Moyers contend that they are entitled to deduct the amount of $ 1,004.22 for interest on the note given to a local attorney for services rendered and subsequently assigned to the attorney who purchased their Pittsburgh home and $ 100 more than allowed by respondent for other interest. In this respect petitioners Moyers have failed to show that they paid any such amounts. Further, while there is no doubt that A.C. was liable at the time he executed the note to pay interest on the principal amount of the note of $ 15,000, petitioners *370 Moyers have not shown that this obligation was not satisfied subsequently upon the execution of the judgment on the note and the purchase by the holder of the judgment at the foreclosure sale of their Pittsburgh home. We conclude that petitioners Moyers have failed to prove that they are entitled to any deduction for interest for 1967, 1968 and 1969 other than the amounts of $ 150, $ 251.64 and $ 103.60 allowed by respondent for these respective years. Section 164 generally allows a deduction for taxes paid within a taxable year. However, taxes are deductible only by the person upon whom they are imposed. Section 1.164-1(a), Income Tax Regs. Petitioners Moyers contend that they are entitled to deduct the amounts of $ 561.08 for real estate tax paid on their home for 1968, and of $ 650.98 for real estate tax paid on their home and of $ 4 for other taxes paid in 1969. They have failed to show that they paid any amount for real estate taxes or any other tax and, even if they had, they have not proved that such taxes were imposed on them. In our view the real estate *371 taxes were imposed on the attorney who had purchased the Pittsburgh home in 1960. We conclude that petitioners Moyers are not entitled to any deduction for tax for 1968 and 1969 other than that allowed by respondent. Section 165(a) generally allows a deduction for any loss sustained within a taxable year and not compensated for by insurance or otherwise. However, section 165(c) limits the deduction for a loss of property not connected with the taxpayer's trade or business, if it arises from a casualty, to the extent the amount of the loss exceeds $ 100. Petitioners Moyers contend they are entitled to a casualty loss of $ 1,500 for damages from an ice and wind storm to the roof of their Pittsburgh home in 1967. Petitioners have not shown that in 1967 an ice and wind storm occurred, that it caused damage to the roof of their Pittsburgh home and that such damage resulted in their having actually sustained a loss and the amount therreof. In fact, they did not incur any loss as they did not in 1967 own the property which they used as their residence in Pittsburgh. Moreover, even if they had proved *372 they sustained a loss in 1967 from a casualty and the amount thereof, they did not show they were not compensated therefor and did not have at that time any reasonable prospect of a recovery. We conclude that petitioners Moyers are not entitled to a deduction for a casualty loss for the year 1967. Section 162 generally provides for a deduction of all ordinary and necessary expenses paid during the taxable year in carrying on any trade or business. Petitioners contend that A.C. is entitled to business expense deductions for automobile expenses in the amounts of $ 800, $ 2,200 and $ 69 for the years 1967, 1968 and 1969, respectively. Petitioners computed the amount of $ 800 deducted for 1967 on the basis of 8,000 miles at $ .10 per mile and the amount of $ 2,200 deducted for 1968 on the basis of 15,000 miles at $ .10 per mile and 10,000 miles at $ .07 per mile. The amount of $ 69 deducted for 1969 represented an amount paid for automobile insurance. The record shows that P.A.C. for whom A.C. did consulting work owned an automobile and in its return for 1967 and 1968 claimed deductions for *373 depreciation, insurance and repairs. Since P.A.C. had no employees, A.C. apparently used the automobile owned by P.A.C. in doing his consulting work. While A.C. paid for the oil and gas he used in operating the automobile, there is no evidence of the amount he paid for oil and gas. The only basis from which to make an estimate of the amount paid is the mileage A.C. testified he drove. There is no evidence that A. C. paid any amount for insurance during 1969. Using the sparse information in this record we conclude that petitioners Moyers are not entitled to any automobile business expense deductions for 1969 but are entitled to deduct $ 240 and $ 750 for the cost of oil and gas to A.C. for his driving for business purposes in 1967 and 1968, respectively. Petitioners Moyers contend that they are entitled to deduct amounts of $ 1,245 and $ 1,400 for legal fees paid during 1968 and 1969, respectively, and petitioner P.A.C. contends that it is entitled to deduct the amount of $ 1,105 as legal fees for 1969. Respondent concedes that the amounts of $ 795 and $ 1,105 were paid by A.C. to an attorney for legal fees relating to tax matters in 1968 and 1969, respectively. Respondent concedes *374 that petitioners Moyers are entitled to deduct the $ 795 paid as legal fees for tax advice in 1968. We hold that petitioners Moyers are entitled to deduct the $ 795 under the provisions of section 212(3) as an amount paid in connection with the determination of a tax. Respondent argues that the amount of $ 1,105 paid in 1969 was for services rendered to A.C. and P.A.C. and that half of the amount paid by A.C. was attributable to services rendered to each. Section 212 generally provides that in the case of an individual there is allowed a deduction for all the ordinary and necessary expenses paid during the taxable year in connection with the determination, collection or refund of any tax. Expenses paid for tax counsel and in connection with the preparation of tax returns or any proceeding involved in determining the extent of tax liability or contesting his tax liability are deductible. Section 1.212-1(1), Income Tax Regs.
Section 162 generally provides a deduction for *375 all ordinary and necessary business expenses paid during a taxable year in carrying on a trade or business. A.C. paid an attorney the amount of $ 1,105 in 1969 for the preparation of the tax return of P.A.C. for 1968 that was filed in 1969, and for counsel for petitioners Moyers and P.A.C. during 1968 and 1969 regarding their respective tax liability for those and earlier years. The interrelationship between A.C. and P.A.C. made each of their liabilities for tax interdependent and in our view the attorney's counsel regarding the tax liability of petitioners Moyers and P.A.C. for 1968 and 1969 was related equally to each of them. We conclude that petitioners Moyers are entitled under section 212 to deduct the amount of $ 552.50 for the year 1969 as an attorney's fee for tax advice and that P.A.C. is entitled to deduct under section 162 the same amount for 1969 which amount was paid on its behalf for the preparation of its tax returns and the determination of its tax liability. A.C. paid to another attorney the amounts of $ 450 and $ 1,400 during 1968 and 1969, respectively, for an appeal taken to the Court of Appeals for the Third Circuit. Petitioners have not shown that the origin *376 and nature of the claim involved in the appeal arose in connection with his business or profit seeking activities so as to cause the attorney's fees to be deductible under sections 162 or 212 and we, therefore, conclude that they are not entitled to any deduction for legal fees paid regarding this appeal. See United States v. Gilmore,372 U.S. 39 (1963). Petitioners Moyers contend that they are entitled to deduct medical expenses in the amounts of $ 839.74 and $ 567.30 for the years 1967 and 1968, respectively. Section 213 provides for a limited deduction for amounts paid for medical care and health insurance for a taxpayer, his spouse and dependents to the extent not compensated for by insurance. Petitioners Moyers have failed to show that they paid any amount for medical care or health insurance during any of the years here in issue. We conclude these petitioners are not entitled to a deduction for medical expenses for 1967 and 1968 other than the amounts allowed by respondent for each such year. Respondent has conceded all but $ 548.28 of the amount of $ 8,833.93 he determined that A.C. received for his services in addition to amounts reported on his return for *377 1967. Respondent contends that A.C. received the amount of $ 8,028.26 (rather than $ 8,833.93) from a local attorney for services rendered and only included $ 7,479.98 of the amount in reporting income on the Moyers' return. Petitioners Moyers contend that they are not required to include in income the amount of $ 548.28. They do not contend that A.C. did not receive the amount of $ 8,028.26 from an attorney but argue that only $ 7,479.98 is includable in their income since A.C. incurred expenses of $ 548.28 in connection with his services for the attorney's client and the $ 548.28 was a reimbursement for those expenses. While the record is not completely clear as to the $ 548.28, in our view it is sufficient to support petitioners Moyers' position that the amount was a reimbursement for expenses and we so hold. While technically the Moyers should probably have included the amount in income and claimed a deduction for a business expense, the result in this case is the same when they included only the net payment for services in their income. We hold under the circumstances that petitioners Moyers are not required to include the $ 548.28 in their income. Petitioner P.A.C. claims a *378 deduction in the amount of $ 2,040 for depreciation for the year 1968 for various items of heavy equipment which it contends had a cost basis of $ 10,200 and a 5-year useful life. Section 167(a) provides for a reasonable allowance for the exhaustion, wear and tear of property used in the taxpayer's trade or business or held for the production of income to be deducted as depreciation in computing taxable income. Petitioner P.A.C. has the burden to show that depreciable assets were acquired, the date of acquisition, the cost or other basis, the useful life and the salvage value of such assets. Petitioner P.A.C. has failed to present any evidence with respect to the various items of heavy equipment for which it claimed a depreciation deduction in 1968. Therefore, we conclude that petitioner P.A.C. is not entitled to a deduction for depreciation for the year 1968. Petitioner P.A.C. contends that it is entitled to a net operating loss deduction of $ 10,000 for each of the years 1968 and 1969. Petitioner P.A.C. has the burden of proving that it sustained a net operating loss for a taxable year *379 and that such a net operating loss is available to be carried to 1968 and 1969. Petitioner P.A.C. argues that it sustained a net operating loss for 1963 and 1964 by losses incurred on the foreclosure sale of its equipment by Capital Factors, Inc. and on the foreclosure sale of its real property that had formerly been used as Moyer Brothers' place of business. Petitioner P.A.C. has not shown that it sustained any loss by these forclosure sales in 1963 or 1964. The returns filed by P.A.C. for its taxable years 1963, 1964, 1966 and 1967 reflected net operating losses in the amounts of,973.79, $ 2,073.28, $ 4,469.16, and $ 3,569.75, respectively. In settlement of litigation involving deficiencies determined by respondent for prior years, petitioner P.A.C. agreed to deficiencies for the years 1962, 1963, 1964 and 1965 in the amounts of $ 2,283.76, $ 1,000, $ 1,000.28 and $ 69.03, respectively. P.A.C. agreed that the deficiency for 1964 was reduced to the amount of $ 443.36 due to a carryback of a net operating loss sustained in 1966. Under the facts here, it is clear P.A.C. had net taxable income for 1965 and a net operating loss for 1966 that was absorbed at least to some extent by the *380 net taxable income for 1964. However on the basis of the record before us, we are unable to determine that P.A.C. sustained a net operating loss for any year other than 1966 and to determine the amount of the net operating loss, if any, for any year from 1963 through 1967. Moreover, the facts presented here do not show that the net operating loss for 1966 has not been absorbed by any net taxable income of those intervening years before 1968 to which the loss may be carried back and forward. We conclude that petitioner P.A.C. is not entitled to a net operating loss deduction in the amount of $ 10,000 for each of the years 1968 and 1969. Petitioners Moyers contend that A.C. did not receive dividend income from P.A.C. in the amounts of $ 824.49, $ 1,971.47, and $ 2,244.95 for the years 1967, 1968, and 1969, respectively. In his notice of deficiency, respondent determined that such amounts for each of these years represented the net taxable income of P.A.C. which was distributed to A.C. during each of these years. We have previously noted that P.A.C. is entitled to a deduction for legal fees in the amount of $ 552.50 for the year 1969. This adjustment will reduce the net taxable income *381 of P.A.C. for 1969 and its available earnings and profits for that year. Respondent has conceded that dividend income was received by the Moyers only from distributions of current earnings of P.A.C. in each of the years 1967, 1968, and 1969. Respondent argues that since his computation of dividends is limited to the current year's earnings and profits of P.A.C. it is immaterial whether P.A.C. had accumulated earnings and profits but argues that the record indicates it did. Petitioners Moyers do not contend that respondent's computation with respect to P.A.C.'s taxable income for 1967, 1968 and 1969 is inaccurate, but for the depreciation deductions, net operating loss deductions and legal expenses we have heretofore discussed. Petitioners' apparent contention is that they did not receive the distributions from P.A.C. Petitioners Moyers have not shown that P.A.C. did not distribute to A.C. any net earnings it had during each of the years 1967, 1968 and 1969. In fact, the record indicates that A.C., the president and sole shareholder of P.A.C., currently received any sums paid to P.A.C. and paid its expenses. For failure to sustain their burden, we hold that petitioners Moyers received *382 dividend income in 1967, 1968 and 1969 to the extent of P.A.C.'s earnings and profits which may be computed in the computation under Rule 155. Petitioners Moyers and petitioner P.A.C. have the burden of proving that the underpayments of tax for each of the years 1967, 1968 and 1969 with respect of petitioners Moyers and 1968 and 1969 with respect of P.A.C. were not due to negligence or the intentional disregard of respondent's rules and regulations. No evidence has been presented to show that petitioners Moyers and petitioner P.A.C. were not negligent or did not intentionally disregard respondent's rules. In fact, in our view petitioners Moyers and petitioner P.A.C. were negligent in not maintaining adequate records of account from which income and deductions could be determined. We conclude that respondent properly determined additions to tax for negligence for petitioners Moyers for each of the years 1967, 1968 and 1969, and for petitioner P.A.C. for each of the years 1968 and 1969. Decisions will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise noted.↩
2. One of the exhibits in this case is the decision of this Court entered March 29, 1971. However, throughout petitioners' brief it is apparent they considered the taxable years 1962, 1964, 1965 and 1966 to be at issue before the Court in the present case. These years are, of course, now closed by our prior decision and are not here at issue.↩
*. As reported.↩
3. Throughout their brief petitioners discuss the taxable years 1962, 1964, and 1965 of P.A.C. as if these years were in issue in the instant case. These years of P.A.C. are, of course, now closed by our decision entered March 29, 1971, and are not here in issue. Petitioners devote much of their argument to their contention that P.A.C. owes no taxes for these years and that the Moyers owe no taxes for the years 1962, 1964, 1965, and 1966, and to their position that the Court should so hold in this case.↩
4. On brief respondent actually concedes that "[legal] fees of $ 795.00 in 1968 and $ 552.50 in 1969 were paid by the Moyers for tax advice and tax services. P.A.C., * * * paid $ 552.50 for tax legal services in 1969."↩
5. Respondent does not affirmatively allege that petitioners Moyers are estopped from contending that they had a net operating loss for 1962, 1964, 1965 and 1966 by the prior decision of this Court with respect to their tax liability for such years. Respondent does contend that the decision of this Court based on the stipulation of the parties of deficiencies in each of these years amounts to an admission that the Moyers did have income and not an operating loss in each of these years.↩
6. Initially we note that the partnership terminated when Jacob withdrew from the two-man partnership. Consequently the partnership did not sustain any loss after 1959 and any loss that it had incurred during a taxable year prior to its termination was deductible to the extent allowable by its partners in the taxable year during which the partnership's taxable year ended. Therefore, even though petitioners argue with respect to partnership losses during the uears from 1960 through 1966, we assume they intend this to be an argument that A.C. sustained such losses as an individual.↩