RAYMOND L. PIERSON and RAEMONA A. PIERSON, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Pierson v. Commissioner
Docket No. 6684-84.
United States Tax Court
T.C. Memo 1986-143; 1986 Tax Ct. Memo LEXIS 466; 51 T.C.M. (CCH) 821; T.C.M. (RIA) 86143; April 14, 1986. *466 Ps dairy farming business was unprofitable. A State court distributed to Ps' creditors the proceeds of an auction and sale of Ps' cattle and farming equipment. Ps claimed that some of the money disbursed to their creditors was in payment of interest, feed, and lawyers' fees, and they deducted such amounts as farming expenses. Held, Ps have failed to prove that any portion of the funds disbursed by the State court were paid for interest. However, they are entitled to deduct all of their claimed feed expenses and a portion of their claimed legal expenses. Raymond L. Pierson and Raemona A. Pierson, pro se. David B. Ferebee, for the respondent. SIMPSON
MEMORANDUM FINDINGS OF FACT AND OPINION SIMPSON, Judge: The Commissioner determined a deficiency in the petitioners' Federal income *467 tax of $15,348.12 for 1981. The issues for decision are whether the petitioners are entitled to deduct certain claimed farm expenses. FINDINGS OF FACT Some of the facts have been stipulated, and those facts are so found. The petitioners, Raymond L. and Raemona A. Pierson, husband and wife, were residents of Tampa, Fla., at the time they filed their petition in this case. They filed their joint Federal income tax return for 1981 with the Internal Revenue Service. The petitioners used the cash method of accounting. From July 1970 to sometime in 1979, the petitioners engaged in dairy farming in the State of New York. During those years, they borrowed unknown amounts of money from Farmers Home Administration, First National Bank of Greene, and International Harvester Credit Corporation. They also borrowed money from Raymond Pierson's father, Kitchel Pierson. On January 1, 1977, Raymond Pierson and Kitchel Pierson executed a security agreement granting Kitchel Pierson a security interest in certain cattle and equipment. The security agreement recited, in part, as follows: WHEREAS, Kitchel Pierson has supplied the Debtors [Raymond and Raemona Pierson] with variou[s] *468 cows and heifers and has also provided downpayments for various pieces of farm machinery described below and herewith agrees to further assist the Debtors in achieving their goal of running a profitable farm operation by using his facilities including barn and feed to enable Debtors to Winter a larger number of cattle then [sic] their own barn would allow, NOW THEREFORE, in consideration of said loans and services, Debtors hereby agree that as of the signing of this agreement they are justly indebted to the Secured Party [Kitchel Pierson] in the amount of Thirty Five Thousand Dollars (35,000.00). * * * In 1977, the petitioners boarded 33 heifers and an unknown number of cows at Kitchel Pierson's farm. In 1978, the petitioners boarded 40 heifers and an unknown number of cows with Kitchel Pierson. Kitchel Pierson provided these animals with hay, grain, and silage, for which he was not paid at the time. The petitioners' dairy farming was not profitable, and in 1979, they were unable to obtain further operating loans. On or about May 21, 1979, the petitioners, at Kitchel Pierson's request, agreed to deliver their cattle and farming equipment to the Burton Livestock Exchange, *469 Inc. (Burton Livestock), for auction. The petitioners' attorney, James Devine, of the law firm of Kiley, Feldman, Whalen, Devine, Zeller & Patane, P.C. (Kiley law office), prepared an agreement whereby Kitchel Pierson and the Farmers Home Administration approved the sale. On May 24, 1979, Burton Livestock auctioned the cattle for $70,760.54 and the equipment for $35,401.50, or a total of $106,162.04. After several of the petitioners' secured creditors contacted Burton Livestock regarding the disposition of the proceeds of the sale, Burton Livestock deducted its sales commission and expenses of $6,168.40 and deposited the remaining proceeds of $99,993.64 with the Oneida Valley National Bank. Two days before the auction, Kitchel Pierson signed a bill for $39,000 itemizing amounts that he claimed the petitioners owed him for (1) the day, grain, and silage provided to the petitioners' cows and heifers in 1977 and 1978 ($36,200), (2) a "transfer system" expense ($400), and (3) the purchase of 4 cows ($2,400). On the day of the auction, a U.C.C. financing statement signed by Raymond and Kitchel Pierson was filed, recording a $39,000 increase in Kitchel Pierson's security interest in *470 the petitioners' property. The petitioners' creditors, including Kitchel Pierson, had previously filed a number of U.C.C. financing statements, some of which appear to have been cumulative or renewals of previous debts. In August 1979, the petitioners instituted a lawsuit against Burton Livestock for the proceeds of the sale. The legal papers were prepared by their attorney, Mr. Devine. Sometime thereafter, Burton Livestock instituted an interpleader action for a determination as to the proper disposition of the sale proceeds. On March 2, 1981, the Supreme Court of the State of New York, sitting in Madison County, issued an order directing that the sale proceeds ($99,993.64), plus the interest that had accrued thereon, be distributed to the petitioners' creditors as follows: Kitchel Pierson
$ 54,500.00
Farmers Home Administration
38,000.00
International Harvester Credit
Corporation
7,800.00
First National Bank in Greene
1,800.00
Wilfred Clark and Thomas Clark, Jr.
1,000.00
William Powers, attorney for
Burton Livestock
1,346.75
Kiley law office
4,000.00
Total
$108,446.75
Total creditor claims had exceeded the amount of the sale proceeds. Kitchel *471 Pierson's claim for the hay, grain, and silage sold to the petitioners in 1977 and 1978 received a preference over the claims of the other creditors. However, neither Kitchel Pierson nor the Farmers Home Administration received as much money as each was owned. The $1,346.75 paid to Mr. Powers, Burton Livestock's attorney, was an additional allowance for fees and expenses associated with the auction and sale of the petitioners' property. The $4,000 paid to the Kiley law office was a legal fee fixed by the court upon the law firm's motion to withdraw as attorneys for the petitioners in their suit against Burton Livestock. On March 3, 1981, the sale proceeds and accrued interest were disbursed as ordered by the court. On their Federal income tax return for 1981, the petitioners reported a long-term capital gain of $85,615 from the 1979 auction of the cattle and farm equipment. They also claimed meal and travel expenses totaling $6,829 as itemized deductions, rental expenses and depreciation totaling $3,696, and a farm loss of $86,621. The farm loss was calculated as follows: Farm income
Less farm deductions: Interest
$44,074
Feed purchased
36,200
Lawyers' fees
6,347
$86,621 Net farm loss
($86,621)
*472 In his notice of deficiency, the Commissioner determined that the petitioners were entitled to no deductions for meal and travek expenses, rental expenses and depreciation, and a farm loss. He now concedes that the meal and travel expenses are deductible as employee business expenses and that the rental expenses and depreciation are deductible. OPINION The issues for decision are whether the petitioners are entitled to deductions for farm-related expenses for interest, feed, and lawyers' fees in 1981. The Commissioner has disallowed all of such claimed deductions because he maintains that the petitioners have failed to substantiate that the auction proceeds disbursed to their creditors were for deductible items rather than for principal due on loans or legal fees arising from personal matters. The petitioners bear the burden of proving their entitlement to the deductions that they claim. Rule 142(a), Tax Court Rules of Practice and Procedure; Welch v. Helvering,290 U.S. 111 (1933). Of the $108,446.75 disbursed by order of the State court, the petitioners claim that $44,074 was attributable to interest due on the petitioners' debts and paid (apparently) *473 to Kitchel Pierson, Farmers Home Administration, International Harvester Credit Corporation, and the First National Bank in Greene. However, there is absolutely no evidence in the record to substantiate that any portion of the amounts paid these creditors was interest rather than principal. The court order directing the disposition of the sale proceeds set out only the total amount to be paid each creditor; it did not state whether any of such amounts was for interest. Raymond Pierson, the sole witness, testified that he assumed interest was paid but did not know the amounts. The petitioners produced no information setting forth the amounts of principal owed the creditors at the time of the auction or distribution. On such record, we are unable to allow an interest deduction even under the rule of Cohan v. Commissioner,39 F.2d 540, 543-544 (2d Cir. 1930), affg. in part and modifying in part, and remanding on this issue 11 B.T.A. 743 (1928). In Cohan, the taxpayer, a theatrical manager and producer, was obliged to incur substantial entertainment expenses in carrying on his business. The Second Circuit held that he was entitled to some deduction, *474 even though he had not and "probably could not" substantiate the exact amount of such expenses, because this Court had found that he had spent substantial sums for entertainment and that these expenses were allowable deductions. Since conly the amount of such expenses was in doubt, we were directed to make as close an approximation as we could, bearing heavily if we chose "upon the taxpayer whose inexactitude is of his own making." 39 F.2d at 544. Thus, in that case, the Court was convinced that some deductible expenses were incurred. Here, the petitioners have failed to prove that any interest was paid, and therefore, we cannot say that the Commissioner erred in disallowing the deduction. The petitioners also claim that $36,200 of the $54,500 disbursed to Kitchel Pierson was in payment of Kitchel Pierson's bill for hay, grain, and silage provided to the petitioners' cows and heifers boarded at Kitchel Pierson's farm in 1977 and 1978. Although the court order disbursing the funds did not specify that any portion thereof was for the feed, we find that the petitioners have carried their burden of proof with respect to the feed deduction. Raymond Pierson testified *475 that his father's claim for items sold to the petitioners (i.e., the hay, grain, and silage) took precedence over the claims of the other creditors, and his recollection is supported by the law of New York regarding the relative priorities of statutory lienors and secured parties. [1] We found the petitioner to be a credible (albeit, somewhat vague) witness, and we are persuaded that $36,200 of the $54,500 paid to Kitchel Pierson was for feed, a deductible expense. The final deduction comprising the petitioners' farm loss is a lawyers' fees expense of $6,347. The petitioners apparently calculated such deduction by adding together *476 the amounts disbursed to (1) Wilfred Clark and Thomas Clark, Jr. ($1,000.00), (2) Burton Livestock's attorney, William Powers ($1,346.75), and (3) the petitioners' lawyers, the Kiley law office ($4,000.00). To determine whether a legal fee is a trade or business expense, as opposed to a nondeductible personal, living, or family expense, we must look to the origin and character of the legal fee. United States v. Gilmore,372 U.S. 39 (1963); Dowd v. Commissioner,68 T.C. 294 (1977). The Commissioner contends that the petitioners have failed to prove that any legal fees were paid or, if such fees were paid, that they originated in the petitioners' business, rather than personal, affairs. We agree with the Commissioner as to the $1,000 paid to the Clarks. The record does not reveal the basis of the Clarks' claim or even that they were lawyers. However, we think the record does establish that the amounts paid Mr. Powers and the Kiley law office were expenses arising from the petitioners' farming business. According to the court order disbursing the auction sale proceeds, the money paid to Mr. Powers was an allowance for fees and expenses associated *477 with the auction and sale. Since Burton Livestock had previously deducted its sales commission and auction expenses from the gross sale proceeds before it deposited the balance with the Oneida Valley National Bank, and since the money was disbursed to Burton Livestock's lawyer, it is reasonable to infer that the amounts paid Mr. Powers were for expenses incurred by Burton Livestock in the litigation over the disposition of the auction proceeds. Similarly, the $4,000 fee paid to the Kiley law office was set by the court upon the law firm's motion to withdraw as the petitioners' lawyers in the proceedings. Because the legal proceedings arose from the auction and sale of the petitioners' cattle and farming equipment--necessitated by the failure of their farming business--we conclude that such payments originated from their farming business and were deductible business expenses. See Dowd v. Commissioner,supra.
Decision will be entered under Rule 155.
Footnotes
1. Under N.Y. Lien Law sec. 183 (McKinney 1966), a person who pastures or boards one or more animals has a lien, dependent upon possession, upon each animal pastured or boarded by him provided an express or implied agreement is made with the owners thereof for the sum due him for the boarding or pasturing of the animal. Under N.Y.U.C.C. sec. 9-310↩ (McKinney 1964), the statutory lien granted those who board or pasture animals and remain in possession of such animals takes priority over a previously perfected security interest.